UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROBIN DISTISO, as Next Friend of | : | |
| NICHOLAS DISTISO, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-cv-1910 (VLB) |
| TOWN OF WOLCOTT et al., | : | |
|     Defendants. | : | October 19, 2010 |

MEMORANDUM OF DECISION AFTER REMAND
FROM SECOND CIRCUIT COURT OF APPEALS

## I. INTRODUCTION

The Plaintiff, Robin DiStiso, initiated this action on behalf of her minor son, Nicholas DiStiso, against the Defendants, the Town of Wolcott (hereinafter the "Town"); the Wolcott Board of Education (hereinafter the "Board"); Thomas Smyth, Superintendent of Wolcott schools; John Cook, principal of Wakelee Elementary School in Wolcott (hereinafter "Wakelee"); Jacqueline Uccello, kindergarten teacher at Wakelee; and Tammy Couture, first grade teacher at Wakelee. The Plaintiff asserted a total of nineteen claims arising from a series of allegedly racially discriminatory incidents at Wakelee.

Senior United States District Judge Peter C. Dorsey previously dismissed seven of the nineteen counts of the complaint. See DiStiso v. Town of Wolcott, No. 3:05-cv-1910 (PCD), 2006 WL 3355174 (D. Conn. Nov. 17, 2006). In March 2008, this Court granted the Town and Board's motion for summary judgment in full and dismissed these Defendants from the case. See Distiso v. Wolcott, 539 F. Supp. 2d 562 (D. Conn. 2008). The Court also granted in part and denied in part

the motion for summary judgment filed by Smyth, and denied the motions for summary judgment filed by Cook, Uccello, and Couture in their entirety.  Id. Defendants Cook, Uccello, and Couture filed an interlocutory appeal of this Court's denial of their motions for summary judgment, arguing that they are entitled to qualified immunity on the equal protection and due process claims asserted in Counts One, Four, and Seven of the complaint.  The Second Circuit vacated the denial and remanded to this Court for further consideration of the qualified immunity defense asserted by these Defendants.  See Distiso v. Wolcott, 352 Fed. Appx. 478 (2d Cir. 2009).

## II.  STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).  "The moving party bears the burden of showing that he or she is entitled to summary judgment."  Huminski, 396 F.3d at 69.  "[T]he burden on the moving party may be discharged by

'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).

## III.  DISCUSSION

The Court assumes familiarity of the facts of this case, which were recounted both by this Court in its March 20, 2009 Memorandum of Decision, and by the Second Circuit in its November 5, 2009 Order.  See Distiso, 539 F. Supp. 2d at 564-67; Distiso, 352 Fed. Appx. at 479-80.  Therefore, the Court discusses the Plaintiff's allegations here only briefly and generally.  Additional facts will be discussed as needed throughout this decision.

The Plaintiff alleges in her complaint that her son, Nicholas, who is a bi-racial African-American, was subjected to student-on-student racial harassment and physical abuse by his classmates and racial discrimination by his teachers, Uccello and Couture, and principal, Cook.  The only claims relevant to this decision are her claims under 42 U.S.C. § 1983 for violation of the Equal Protection and Due Process Clauses of the United States Constitution, which are asserted in Counts One, Four, and Seven of the complaint.  Specifically, the Plaintiff claims that Defendants Cook, Uccello and Couture committed equal

protection and due process violations in the following ways.  First, she claims that all three Defendants failed to protect Nicholas from racial harassment inflicted on him by his kindergarten and first grade peers.  Second, she claims that Uccello forced Nicholas to use a dark brown crayon to draw his self-portrait instead of the crayon he had chosen.  Third, she claims that Couture assaulted Nicholas by forcibly grabbing him by the arm, pulling him out of his chair, and dragging him to the classroom door.

In its prior ruling, the Court held that Defendants Cook, Uccello, and Couture were not entitled to qualified immunity with respect to the Plaintiff's due process and equal protection allegations contained in Counts One, Four, and Seven of the complaint because Nicholas DiStiso's right to be free from a racially discriminatory environment was clearly established.  See Distiso, 539 F. Supp. 2d at 569.  As directed by the Second Circuit, the Court now articulates its reasoning for that holding in light of the specific context of this case.  See Distiso, 352 Fed. Appx. at 3.

The doctrine of qualified immunity shields government officials performing a discretionary function "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzerald, 457 U.S. 800, 818 (1982).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has shown make out a violation of a

constitutional right.  Id. at 201.  Second, if the plaintiff satisfies the first step, the court must then decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct.  Id.

Subsequently, in Pearson v. Callahan, 129 S.Ct. 808 (2009), the Supreme Court ruled that the Saucier approach for determining whether a government official is entitled to qualified immunity should no longer be considered mandatory.  Following Pearson, lower court judges are permitted to exercise their discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.  Id. at 817.  The Pearson Court observed, however, that the Saucier approach is often beneficial, such as in cases where it "may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be."  Id. at 818.

The Second Circuit has considered the following three factors in determining whether a particular right was clearly established:  "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful."  Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991); see also Saucier, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right

is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

When considering a qualified immunity defense, a court must determine whether the right at issue was clearly established "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. The contours of the right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

## A. Equal Protection

The Court will first consider whether qualified immunity bars the Plaintiff's equal protection claims against Cook, Uccello, and Couture. The Plaintiff claims that these Defendants violated the Equal Protection Clause by demonstrating deliberate indifference to racial discrimination and harassment of Nicholas by other students at Wakelee as well as by directly discriminating against Nicholas themselves. On appeal, the Second Circuit directed the Court to consider the facts of this case in light of its decision in Gant v. Wallingford Board of Education, 195 F.3d 134 (2d Cir. 1999).

In Gant, the parents of a first grade student, Ray Jr., brought suit against the Wallingford Board of Education, the board members, the superintendent of schools, the school principal, and his first grade teacher for violating the Equal Protection Clause by allegedly failing to protect him from known racial harassment. 195 F. 3d at 138. Several months after the harassment allegedly

began, the plaintiffs complained to the superintendent, who conducted an investigation and reported his findings to the board of education.  Id.  The superintendent reported that he was unable to find "persuasive evidence" that Ray Jr. was subjected to continuous racial harassment, and he determined that the staff at the elementary school had appropriately addressed the known incidents giving rise to the plaintiffs' complaint.  Id.  The district court granted the defendants' motion for summary judgment, holding that the school officials' response to the known racial incidents was appropriate and did not rise to the level of "deliberate indifference" necessary to maintain an equal protection claim.  Id. at 139.

The Second Circuit affirmed the district court's decision on appeal.  In the majority opinion, the Second Circuit discussed the appropriate standard for addressing claims involving student-on-student racial harassment in the public school setting.  The Second Circuit found that, to succeed on a claim of race discrimination against teachers, administrators, and other school officials based upon their responses to harassment in the school environment, a plaintiff "must show deliberate indifference on the part of the defendants themselves."  Id. at 140.  The Second Circuit explained the circumstances in which deliberate indifference can be found as follows:

> Deliberate indifference to discrimination can be shown from a defendant's actions or inaction in light of known circumstances.  The ultimate inquiry, of course, is one of discriminatory purpose on the part of the defendant himself.  Thus, to establish a violation of the Equal Protection Clause or § 1981, a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination

7

> to occur.  It is not necessary to prove that the defendant fully appreciated the harmful consequences of that discrimination, because deliberate indifference is not the same as action (or inaction) taken maliciously or sadistically for the very purpose of causing harm.  Instead, deliberate indifference can be found when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances.

Id. at 141 (internal citations and quotation marks omitted).  The Second Circuit cautioned, however, that the deliberate indifference standard is "not a mere reasonableness standard that transforms every school disciplinary decision into a jury question."  Id. (internal quotation marks omitted; citation omitted).  Thus, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment . . . , could not identify a response as not 'clearly unreasonable' as a matter of law."  Id.

The Second Circuit then proceeded to evaluate each staff member's response to the known incidents of harassment individually.  As to the first grade teacher, the Second Circuit noted that she did not witness any student-on-student racial harassment, and thus, they could only consider her response to information about racial discrimination that she learned from others.  Id. at 141.  The record indicated that she only knew about one incident that occurred while the children were being supervised by another teacher at recess.  Id.  at 142.  The witnesses' accounts of the incident differed, but established that other boys in Ray Jr.'s class either called him "black spot" or stated "something about chocolate pudding" possibly in reference to him.  Id. at 142.  The supervising teacher claimed that she talked to the harassers and reported the incident to the

first grade teacher and the principal.  Id.  The first grade teacher admitted that she did not take any direct action in response to the incident, because she believed that discussing the incident with the entire class would have caused more harm than good and the best course was "to keep an open eye on" the situation.  Id.  The Second Circuit held that the teacher's failure to respond to this single incident, as a matter of law, was not "so clearly unreasonable as to amount to deliberate indifference."  Id.  The Second Circuit further observed that Ray Jr. had testified that he was called "nigger" and "chocolate drop" by other children at the school and that on one occasion he had complained to his first grade teacher that other students were "calling him names," to which she allegedly responded "we don't tell on other students."  Id. at 142-43.  However, the record contained no evidence that Ray Jr. told the teacher that the name-calling was racial in nature, nor was there any evidence indicating that he reported the name-calling to the teacher after she had learned of the aforementioned incident such that a jury could infer that she was deliberately indifferent to racial name-calling.  Id. at 143-44.  Therefore, these statements were not considered as part of the deliberate indifference analysis.  Id.

With respect to the school principal, the Second Circuit identified two incidences of harassment of which she was aware.  The first was the incident that had occurred during recess.  Id. at 144.  The principal was notified of the incident, but was also informed either that the harassers had been reprimanded and had apologized to Ray Jr., or that the comment was unattributable, possibly innocent,

and likely unheard by Ray Jr.  Id.  The Second Circuit held that, in these circumstances, the principal's lack of a response could not, as a matter of law, give rise to a finding of deliberate indifference.  Id.  The second incident occurred while Ray Jr. was riding the school bus.  At a bus stop, the driver overheard a mother say to her child something to the effect of "Oh you have to ride with a Nigger."  Id.  Ray Jr.'s mother learned of the incident the following day, and reported it to his teacher at the time.  Id.  In response, the teacher held "a class meeting on name-calling," in which she reminded children of previous discussions about "people being different" and told them that any name-calling was unacceptable.  Id.  Ray Jr.'s mother also discussed the bus incident with the principal.  Id.  The principal later checked with the teacher and learned of the class meeting.  Id.  Other than checking with the teacher, the principal took no action in response to the incident.  Id.  She justified her inaction by explaining that the incident had occurred on the street rather than on school property, and that she had no control of the neighborhood.  Id.  The Second Circuit held that, in light of the circumstances, it was not "clearly unreasonable as a matter of law" for the principal to be satisfied with the teacher's response and take no direct action herself.  Id. at 145 (internal quotation marks omitted).

Judge Calabresi wrote a concurring opinion in Gant in which he agreed with the majority's conclusion under the circumstances presented, but expressed his belief that the situation would be different if there was evidence of intentional discrimination by school officials themselves along with student-on-student

racial harassment.  Id. at 150.  As Judge Calabresi explained, "[i]n such a case - i.e., where a school official commits, or knows of, a contemporaneous or otherwise related act of intentional discrimination against a student who is complaining of student-on-student harassment - it would, I believe, be necessary to consider that act of *discrimination* as part of the Davis analysis to determine whether the response of school officials to the *harassment* was 'clearly unreasonable in light of the known circumstances.'"  Id. (quoting United States v. Davis, 556 U.S. 629, 630 (1999)).

The Court has reviewed the record in this case, and will now proceed to evaluate each Defendant's response to known incidents of harassment and abuse identified in the record, noting that on a motion for summary judgment the facts are viewed in the light most favorable to the Plaintiff.

## 1.  Uccello

According to the deposition testimony of the DiStisos, other students began physically abusing Nicholas and calling him names shortly after he began kindergarten.  The first alleged incident occurred during the first week of September, when a female student slapped Nicholas in the face and called him "nigger."  R. Distiso Dep. at 102-04, 143.  Robin DiStiso claimed that she went to the school the next day, and reported the incident to Uccello as Nicholas had relayed it to her.  Id.  In response, Uccello said that she would speak to the offending student.  Id.  There is no evidence in the record that Uccello spoke to

the offending student and no indication of whether the student admitted making the offending statement and hitting Nicholas.

The DiStisos testified that, over the course of the next several weeks and throughout the school year, other students continued to call Nicholas racially derogatory names such as "nigger" and "blackie." Robin DiStiso testified that the first time a student called Nicholas "blackie," she wrote to Uccello and asked her to talk to the offending student about calling Nicholas names. Id. at 126. However, she admitted that she did not identify the name that the student used in reference to Nicholas. Id. Uccello replied with a letter stating that she talked to the offending student and he denied calling Nicholas names. Id. at 126-27. Uccello took no further action in response to this incident. Id.

On another occasion, other students called Nicholas "blackie" while they were on the playground during a game of tag. P. DiStiso Dep. at 45. Robin DiStiso spoke to Uccello in person and relayed exactly what the other students were calling Nicholas and asked her to speak to the students because the name-calling was upsetting Nicholas. Id. at 47-48. There is no evidence in the record that Uccello took any action in response to this incident.

On yet another occasion, a student asked Nicholas while in the bathroom why the dirt did not come off of his skin when he washed his hands. Id. at 82. Robin DiStiso claims that Nicholas informed Uccello of this incident, and also that she had Nicholas deliver a letter to Uccello stating that the other students

12

were calling Nicholas names.  Id.  Again, there is no evidence in the record that Uccello took action in response to this incident.

In addition to the incidents described above, the DiStisos both testified that other students called Nicholas "blackie" and "nigger" several other times throughout the school year.  R. DiStiso Dep. at 122; P. DiStiso Dep. at 45-46, 62. While the timing and specific details of these incidents is unclear from the record, the DiStisos claim that when Nicholas informed them of the name-calling, Robin DiStiso would usually either call Cook or write a note to Cook or Uccello.  R. DiStiso Dep. at 158-61; 166; P. DiStiso Dep. at 62-63.  Philip DiStiso admitted that he was unable to recall ever speaking with Uccello himself.  P. DiStiso Dep. at 63. Robin DiStiso also testified that she went to the school and asked Uccello to speak with her outside of the classroom about the name-calling on multiple occasions.  R. DiStiso Dep. at 136.  On one of these occasions, Robin DiStiso told her that Nicholas' classmates were calling him names such as "blackie," "nigger," and "dirty hands."  Id. at 136-37.  In response, Uccello said that she would speak to the students in the class who were calling Nicholas names.  Id. at 137.  However, there is no evidence in the record that she did so, or that she took any other curative action.

Nicholas was himself deposed on February 24, 2006, approximately three and a half years after the alleged incidents began to occur, when he was eight years old.  During his deposition, Nicholas indicated that "mean kids" at Wakelee had called him "bad names," including the "N word."  N. DiStiso Dep. at 49-53.

However, it is unclear from his testimony whether he independently remembered being the target of racial slurs, or whether instead he was basing his testimony on coaching done by his mother prior to the deposition.

The DiStisos also claim that Nicholas was physically abused by his classmates on a consistent basis throughout the school year. For instance, on one occasion, another student pinched Nicholas. Id. at 110, 144. Robin DiStiso wrote a note to Uccello informing her of the incident. Id. at 110, 234. Uccello responded with the following letter, dated October 4, 2010:

> Actually, what happened yesterday was just a quick tiff between the two boys. It started by Nicholas stepping on Justin's foot, and Justin's reaction was to pinch him. I witnessed the whole thing and spoke with both boys about keeping their hands and feet to themselves. I also explained that if someone does something that upsets you, you need to use your words and tell the teacher.

Def. Exh. J. Another time, a student hit Nicholas after Nicholas stepped on his foot. Id. at 81. Robin DiStiso testified that she sent a letter to Uccello informing her of the incident, and that Uccello responded by stating that the student hit Nicholas because Nicholas had stepped on his foot on purpose. Id.[1] On yet another occasion, a student spit in Nicholas' face. Robin DiStiso testified that she sent a letter reporting the incident to Uccello. Id. She claims that Uccello

---

[1] It is not entirely clear from Robin DiStiso's testimony whether or not this incident was separate from the pinching incident. Robin DiStiso briefly mentioned the alleged hitting incident early in her deposition, and later discussed the pinching incident in greater detail after opposing counsel questioned her regarding the October 4, 2010 letter. However, since the evidence on summary judgment must be viewed in the light most favorable to the non-moving party, the Court will assume that there were in fact two separate incidents in which another student attacked Nicholas after Nicholas stepped on his foot.

replied with a letter stating that the student was just talking and the spit came out by accident.  Id.  The letters discussing this incident are not in the record, and there is no evidence establishing the basis of Uccello's conclusion that the spitting incident was accidental.  Robin DiStiso further claims that she wrote notes to Uccello and spoke to her in person complaining that other students kicked and bit Nicholas.  Id. at 108, 111.  There is no evidence in the record that Uccello took any action in response to these incidents or complaints.

Finally, the DiStisos identify what they claim to be a direct act of racial harassment by Uccello herself.  There is conflicting evidence regarding the date of this incident.  The Plaintiff alleges that it took place in December 2002, while the Defendants claim it transpired in June 2003.  On the day in question, Uccello had all of her students draw a self-portrait of themselves to be included on the front cover of a photograph album that Uccello made for each student.  The DiStisos testified that Nicholas was coloring his face with a yellow crayon, and Uccello took away the yellow crayon and forced him to use a brown crayon to draw himself instead.  R. Distiso Dep. at 77; P. DiStiso Dep. at 10, 26-27, 126, 186.  Philip DiStiso testified that Nicholas was very upset by the incident.  P. DiStiso Dep. at 27.  Nicholas also provided testimony regarding the crayon incident.  N. DiStiso Dep. at 19-22.  However, as with his testimony regarding name-calling, it was unclear whether Nicholas independently remembered the incident which had occurred three years earlier when he was five years old, or whether his recollection was based upon coaching by his mother.  Uccello denies forcing

Nicholas to use a brown crayon to draw himself, and instead states that Nicholas chose the brown crayon on his own. Uccello Aff. ¶ 16. The DiStisos do not allege that they spoke with Uccello regarding the crayon incident.

On May 7, 2003, Robin DiStiso filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") against the Board of Education on behalf of Nicholas. In the CHRO complaint, Robin DiStiso alleged that Nicholas was subjected to verbal harassment and physical assaults by his classmates since nearly the beginning of kindergarten. See Def. Ex. K. The complaint alleged that Nicholas was called the names "blackie" and "nigger" and had been referred to as "dirty." Id. The complaint further alleged that Nicholas was kicked and hit. Id. According to the complaint, Robin DiStiso began to complain to Uccello and Cook about the harassment approximately two weeks after school started, but no effective action was taken to eliminate the harassment and abuse. Id.

Notwithstanding the DiStisos' assertions to the contrary, Uccello claims that the CHRO complaint was the first time either of the DiStisos had ever made any complaint that Nicholas was being discriminated against or harassed because of his race. Uccello avers that she had discussions with the DiStisos about Nicholas' behavioral problems on multiple occasions, but that they never complained to her that Nicholas' peers were discriminating against him or harassing him because of his race. Uccello Aff. ¶¶ 7-11. Smyth and Cook both provided affidavits stating that they conducted what they characterize as a

"thorough" and "full" investigation into the allegations made in the CHRO complaint, and were unable to identify any evidence that Nicholas was being discriminated against or harassed because of his race.  <u>See</u> Smyth Aff. ¶ 12; Cook Aff. ¶ 11.  Uccello was interviewed as part of the investigation, but she disclaimed having any knowledge that Nicholas was being discriminated against by his classmates because of his race.  <u>See</u> Smyth Aff. ¶ 12.  Apart from interviewing Uccello, however, Smyth and Cook do not identify any specific actions they took to investigate the DiStisos' claims of racial discrimination alleged in the CHRO complaint.

Viewing the evidence outlined above in the light most favorable to the Plaintiff, the Court concludes that Uccello is not entitled to qualified immunity under the particular circumstances of this case.  As an initial matter, the Court finds that the right to be free from student-on-student racial discrimination was clearly established at the time of the Defendants' alleged misconduct.  In <u>Gant</u>, the Second Circuit held that a plaintiff may succeed on a claim of race discrimination against a schoolteacher or administrator based upon student-on-student harassment if the plaintiff is able to show "deliberate indifference" on the part of the defendants themselves.  195 F.3d at 140.  In order to show deliberate indifference, the plaintiff must demonstrate that the "defendant's response to known discrimination is clearly unreasonable in light of the known circumstances."  <u>Id.</u> at 141.

Next, the Court concludes that, if the jury were to find the evidence presented by the Plaintiff to be true, it would support a deliberate indifference claim. Unlike Gant, where the teacher being sued was aware of only one incident that could arguably be construed as racial harassment, in this case the Plaintiff presented evidence of a consistent pattern of racially derogatory name-calling and physical abuse by other students that occurred throughout the kindergarten school year. The DiStisos claim that they personally informed Uccello of the exact names that Nicholas was being called on multiple occasions, the first time being in September shortly after the beginning of the school year. The names that Nicholas was being called by other students, such as "nigger" and "blackie," were clearly racially derogatory in nature. In addition, the DiStisos identify numerous instances in which they reported to Uccello that Nicholas was being physically abused by other students. While it does not appear from the record that the DiStisos explicitly informed Uccello that they believed Nicholas was being physically abused because of his race, such an inference could be drawn by the jury based upon the fact that the physical abuse occurred contemporaneously with or after racially-derogatory name-calling of which the DiStisos claim they made Uccello aware. See Patenaude v. Salmon River Central School District, No. 3:03-CV-1016, 2005 WL 6152380, at *8 (N.D.N.Y. Feb. 16, 2005) ("[A] fair-minded trier of fact could reasonably conclude that, once the school district was aware of potential racial discrimination, all the other incidents to which Plaintiff was subject (e.g. physical assaults, non-race-based name-calling,

the doctored picture, etc.) were in furtherance of the race-based harassment."); The DiStisos assert that, in response to these incidents, Uccello either took no action at all or placed blame for the incident on Nicholas after speaking with the offending student.

In her defense, Uccello denies having had any knowledge of Nicholas being harassed or discriminated against because of his race until the filing of the CHRO complaint in May 2003. However, based upon the countervailing evidence presented by the DiStisos, there are clearly questions of material fact regarding whether and at what point Uccello became aware of any racially motivated name-calling and physical abuse. If the jury were to credit the testimony of the DiStisos, as they would be entitled to do, a reasonable teacher in Uccello's position would have understood that her conduct constituted deliberate indifference to Nicholas' right to be free from racial discrimination by other students in school.

Moreover, the Court must consider the crayon-drawing incident as part of the deliberate indifference analysis. See Gant, 195 F.3d at 150 (Calabresi, J., concurring) (noting that acts of discrimination by a school official against a student who is complaining of student-on-student harassment must be considered in determining whether the response of school officials to the harassment was "clearly unreasonable in light of the known circumstances"). During this incident, Uccello allegedly forced Nicholas, against his will, to draw his self-portrait with a brown crayon rather than a yellow crayon. If this incident

19

indeed occurred in the manner alleged by the DiStisos, it could reasonably be interpreted as a direct act of discrimination by Uccello herself, further bolstering the conclusion that a jury may well find that Uccello's response to the consistent name-calling and physical abuse perpetrated against Nicholas by other students was clearly unreasonable in light of the known circumstances. Therefore, the Plaintiff's equal protection claim against Uccello will proceed to trial.

### 2. Couture

Couture is in a somewhat different position than Uccello. Couture was Nicholas' first grade teacher, and there is no evidence in the record that she had any contact with him prior to late August 2003. While the CHRO complaint was pending at the time Nicholas entered first grade, Couture has averred that she had no knowledge of the complaint. Couture Aff. ¶ 6. In addition, Uccello and Cook submitted affidavits stating that they did not inform Couture of Nicholas' problems in kindergarten or of the CHRO complaint. Uccello Aff. ¶17; Cook Aff. ¶ 13. Notwithstanding these denials, in light of the substantial evidence in the record regarding the pervasive pattern of racial animus and physical abuse directed at Nicholas by other students during kindergarten, it would be reasonable for a jury to conclude that Couture was aware of the prior racial discrimination against Nicholas. Indeed, a careful reading of Couture's affidavit reveals that she has not affirmatively disclaimed knowledge of the history of racial discrimination against Nicholas. In her affidavit, Couture avers that, when Nicholas began her first grade class, she did not know about the pending CHRO

charge.  She does not, however, indicate that she was entirely unaware of the history of racial discrimination against Nicholas by other students at Wakelee.  Instead, she merely states that she was not told about "Nicholas' problems in kindergarten or his parents' allegations of racial discrimination" by Uccello, Cook, or Smyth.  Couture Aff. ¶ 7.

Further, it is reasonable to presume that Couture familiarized herself with the histories of her incoming students in order to develop her teaching plan.  This is particularly true in Nicholas' case.  As reflected in the record of this case, in addition to the abuse and racial harassment that Nicholas suffered at the hands of other students, Nicholas had significant learning difficulties in kindergarten that led to his referral for special education services in accordance with the federal Individuals with Disabilities and Education Act ("IDEA"), 20 U.S.C. § 1401 et seq and state special education laws, Conn. Gen. Stat. § 10-76a et seq.[2]  Two "Planning and Placement Team" ("PPT") meetings were held for Nicholas during kindergarten, the first taking place on October 2, 2002, and the second taking place on December 17, 2002.  See Doc. ##21-4, 21-10.  Following the first PPT,

_____

[2]  The Plaintiff alleged in the complaint that Nicholas did not in fact need special education services, but that the Defendants falsely claimed that Nicholas required special education in retaliation for the Plaintiff's complaints of racial harassment and discrimination.  Compl. ¶¶ 26-30.  The full factual circumstances surrounding Nicholas' referral for special education services are detailed in Judge Dorsey's Ruling on the Defendants' Motions to Dismiss.  See DiStiso v. Town of Wolcott, No. 3:05-cv-1910 (PCD), 2006 WL 3355174 (D. Conn. Nov. 17, 2006).  Judge Dorsey dismissed all claims in connection with Nicholas' referral for special education services, and therefore these claims are not currently before the Court.  Id. at *3-5.

Nicholas was referred for speech/language therapy, occupational therapy, psychological, and educational assessments. Doc. #21-4. The assessments were carried out in October and November 2002. Nicholas presented with significant deficits in speech and language, visuospatial skills, and fine motor skills. Doc. ##21-6, 21-7, 21-8, 21-9. Thereafter, during the second PPT, a professional recommendation was made to place Nicholas in special education. Doc. #21-10. However, the DiStisos refused to consent to the PPT's recommendations for special education placement, and instead provided consent only for in-class speech/language services on February 13, 2003. Doc. ##21-11. Following continued classroom problems, Smyth, Cook, and Deborah Wheeler, the former director of special education for Wakelee, proposed that Nicholas undergo a neuropsychological examination. Doc. #21-12. The DiStisos responded by letter dated May 29, 2003 stating that Nicholas did not require special education and accusing Cook of harassment. Doc. #21-13. In June 2003, the DiStisos withdrew their consent for in-classroom special education services.

After Nicholas began first grade, Couture immediately noticed deficits in Nicholas' learning and called an Early Intervention Team ("EIT") meeting, which was convened on October 20, 2003. Doc. ##21-14, 21-16. Thereafter, another PPT took place on November 3, 2003. Doc. #21-17. As Nicholas' teacher, Couture was a member of the PPT and attended the meeting. Id. However, the DiStisos refused to attend the PPT or consent to a reevaluation for special education services. The PPT reiterated the earlier recommendation that a

neuropsychological examination was necessary to fully assess Nicholas' needs. Id. Ultimately, on December 19, 2003, the Board initiated impartial due process proceedings against the DiStisos pursuant to the IDEA and state special education law as a result of their failure to consent to neuropsychological testing. See Doc. #21-36. The case was assigned to Hearing Officer Deborah R. Kearns and a hearing took place on February 17 and 18, 2004. Id. At the hearing, the DiStisos presented evidence to support their belief that Nicholas was being forced into special education because of his race. Id. at 4. On February 27, 2004, Hearing Officer Kearns issued a decision ordering the DiStisos to allow the school to conduct neuropsychological testing and to develop an appropriate individualized education plan ("IEP") for Nicholas. Id. The Hearing Officer did not credit the DiStisos' argument that Nicholas was referred for special education because of racial discrimination. Id. The DiStisos failed to appeal the Hearing Officer's decision. Id. However, the neuropsychological evaluation never actually took place because, as described in greater detail below, the DiStisos removed Nicholas from Wakelee in March 2004.

Although Couture disclaims having had knowledge of Nicholas' problems during kindergarten, given her involvement in the PPT process as Nicholas' first grade teacher, it would have been prudent for her to review the findings of the prior PPT in order to develop an appropriate IEP for him. Since the DiStisos had previously alleged that the special education referral itself was done in retaliation for their complaints of racial harassment by Nicholas' peers, it would be

reasonable for a jury to infer that Couture had knowledge of those allegations, notwithstanding her self-serving and conclusory denial in her affidavit. Furthermore, even if Couture was truly unaware when Nicholas entered kindergarten of the prior racial harassment and abuse by Nicholas' peers and the DiStisos' complaints regarding that harassment and abuse, there is sufficient evidence in the record from which a jury could infer that she became aware of the allegations early in the first grade. Specifically, as discussed above, the DiStisos renewed their allegation that Nicholas was referred for special education services in retaliation for their complaints of racial discrimination during the course of the due process proceedings initiated by the Board against the DiStisos on December 19, 2003. Couture was integral to those proceedings because she was a member of the PPT and had in fact initiated the PPT in first grade.

The DiStisos do not identify any specific instances during the first grade in which Nicholas was called racially derogatory names by other students. However, they did testify regarding a number of instances in which Nicholas was physically abused by other students, continuing the pervasive pattern of abuse that began during kindergarten. In light of the substantial evidence in the record regarding racial animus directed at Nicholas during kindergarten, it would be reasonable for a jury to conclude that the instances of physical abuse that occurred during first grade were racially motivated as well. See Patenaude, 2005 WL 6152380, at *8; see also Scruggs v. Meriden Board of Educ., No. 3:03-CV-2224 (PCD), 2007 WL 2318851, at *13-14 (D. Conn. Aug. 10, 2007) (finding that, given the

pervasive nature of harassment and physical abuse perpetrated against plaintiff's son by his peers, a reasonable reading of the record compelled the conclusion that defendants, the school board and certain school officials, were well aware of the harassment and physical abuse even though no evidence was offered regarding which teachers or administrators actually witnessed the alleged incidents in question).

First, Robin DiStiso testified regarding occasions on which another student threw juice on Nicholas in the cafeteria, which she claimed occurred several times during the first grade. R. DiStiso Dep. at 112-13, 244-45. Robin DiStiso reported these incidents to Couture and Cook in October 2003. Cook investigated the complaint and wrote back stating that he spoke to the lunch aide, who indicated that Nicholas spilled the juice himself and she helped him to clean it up. Id. at 245; Exh. V.

Robin DiStiso also testified as to an occasion on which a female student kicked Nicholas while at lunch. Id. at 248-49. Robin DiStiso wrote a note to Couture complaining of the incident on February 3, 2004. Id.; Def. Exh. DD. She was unable to recall whether she received a response from Couture. However, Cook responded the following day and explained that he had met with the students individually and then together to obtain information about the incident, and also spoke with the lunch aide, who indicated that she did not see the incident occur but would "keep a close eye on the situation." Id.

On February 9, 2004, Robin DiStiso again sent a note to Couture complaining that other children were hitting or kicking Nicholas.  <u>See</u> Def. Exh. HH.  The note read:

> This is about the fifth time I sent you a note about one of Nicholas['s] classmates hitting him or kicking him.  After every note, you respond by sending a note claiming Nicholas is misbehaving . . . .  I know why you are doing this and [your] time will come when you can testify as to why!  I can't believe how you can pick on a little boy just to satisfy Mr. Cook.  This is wrong and you would not want someone to do this to your child.  You obviously don't think that Nicholas knows what's going on.  Well think again, because he sees and hears everything and he knows how you mistreat him and that is why the other children in the class mistreat him.

<u>Id.</u>  In response to the letter, Cook investigated and determined that a boy had hit Nicholas in order to stop Nicholas from hitting a third boy.  <u>See</u> Def. Exh. II and JJ.  Cook had a conference call with all of the parents, during which Philip DiStiso stated that he told Nicholas to defend himself if another child hurt him.  Def. Exh. JJ.

The DiStisos further claim that Couture regularly complained about Nicholas' behavior and sent home several papers that Nicholas completed with the words "done with help" written across the document.  R. DiStiso Dep. at 90; P. DiStiso Dep. at 188-89.  The DiStisos believed that Couture's conduct was racially motivated and done at the suggestion of Cook.  <u>Id.</u>  Couture, on the other hand, avers that Nicholas had learning, behavioral, and social deficits and frequently misbehaved in school, which prompted her to complete incident reports and send letters to the DiStisos regarding Nicholas' conduct.  <u>See</u> Couture Aff. ¶¶ 8-32.

The DiStisos' conflict with Couture culminated on March 15, 2004, when Philip DiStiso called the police to Wakelee alleging that Couture had assaulted Nicholas three days earlier after Nicholas complained of pain in his arm and foot. The DiStisos claim that Couture accused Nicholas of talking in class, and ordered him to go to the principal's office. R. DiStiso Dep. at 20; P. DiStiso Dep. at 107-11. Nicholas refused, indicating that it was the student beside him who had been talking. Id. Thereafter, the DiStisos claim, Couture grabbed Nicholas by the arm and pulled him out of his chair, causing him to fall to the ground and hit his legs on his desk. Id. She then allegedly dragged him across the classroom and to the principal's office. Id. At his deposition, Nicholas recalled the incident and testified that Couture pulled him out of his chair by the arm, dragged him across the floor, and brought him to the principal's office. N. DiStiso Dep. at 23.

Officer Jeffrey Egan, the police officer who responded to the alleged assault, conducted an investigation which consisted of discussions with Couture, Cook, Smyth, and Al Blancato, the teachers' union representative. Def. Exh. UU. None of these people other than Couture were reputed to have any knowledge of the incident, nor was the union representative reputed to have had any right to be made privy to the investigation. Officer Egan also spoke to Nicholas, who indicated that his right arm and right heel hurt. Id. Officer Egan examined Nicholas' arm and foot and noted that he did not have any marks or bruises. Officer Egan and another officer returned to Wakelee the following day, at which point they spoke with two other teachers, both of whom stated that they saw

Couture and Nicholas walking down the hall peaceably on the day in question en route to the principal's office.  Another witness, the school nurse, also told them that Nicholas went to her office on that day complaining of arm pain, and stated that he threw a large rock at recess.  Officer Egan did not speak to any of the students who were present during the incident in which Nicholas claimed he was injured, but concluded that there was no probable cause to substantiate the alleged assault and therefore closed the case.  See Police Report, Exh. UU; Egan Aff. ¶ 16.  As explained more fully below, however, the affidavits signed by students and filed by the Defendants in support of their motion for summary judgment lend some support to the claim that Nicholas was mistreated and in some cases are inconsistent with the teachers' account of events contained in the police report.  Def. Exh. AAA - HHH.

Philip DiStiso also filed a complaint with the State of Connecticut Department of Children and Family Services ("DCF").  On March 18, 2004, a school official wrote an e-mail to Smyth, ccing Cook, in which he postulated about the outcome of the DisStisos' complaint and another complaint to DCF lodged against the school.  The e-mail quoted the DCF worker as having said she was "confident she would find no evidence of physical abuse in the ND case."  In the e-mail, the official also discusses lodging complaints with DCF against both families for educational neglect.  Def. Exh. LLL.  Subsequently, on August 20, 2004, DCF issued a one-page notification stating that the allegations of physical

abuse against Nicholas were "unsubstantiated" and noting that the case had been closed.  <u>See</u> DCF Report, Def. Exh. III.

On the day the complaint to the police was made, Philip DiStiso threatened to pursue criminal charges if a scheduled doctor's examination revealed that Nicholas was injured.  Philip DiStiso took Nicholas to Dr. Oscar J. Ransome for a medical evaluation of his right arm and foot.  Dr. Ransome was unable to find any objective evidence of injury, such as fracture, bruising, or swelling, and he informed the DCF worker investigating the complaint that there was no physical sign that Nicholas had been injured.  <u>See</u> Ransome Evaluation, Exh. JJJ.  Dr. Ransome did not, however, rule out an assault of Nicholas, testifying that he believed that Nicholas may have had a muscle strain based upon the reports of pain by Nicholas and his parents.  Ransome Dep. at 72-74.

The DiStisos removed Nicholas from Wakelee after the alleged assault and placed him in a private school.  The school lodged a formal parental neglect complaint with DCF on March 26, 2004.  Def. Exh. QQQ.

While Couture denies having assaulted Nicholas, even the exhibits filed by the Defendants in support of their motions for summary judgment contain conflicting versions of the incident.  Couture did not mention any altercation with Nicholas to the police officer who investigated the DiStisos' assault complaint.  Def. Exh. UU.  The investigating officer's report simply states that she escorted Nicholas to the principal's office without touching him, consistent with school policy.  <u>Id.</u>  The report included statements from two teachers and the school

nurse, who claimed that they observed Couture and Nicholas walking down the hall peaceably and that they did not see Couture touch Nicholas.  Id.  The Defendants also submitted affidavits by several of Couture's first grade students which lend some support to the claim that Nicholas was mistreated and in some cases are inconsistent with the teachers' accounts of events contained in the police report.  Dana Blasi, Nicholas' classroom helper, states that she did not see Couture mistreat Nicholas, but she does not say that she was present on the day in question.  Def. Exh. AAA.  Similarly, the affidavits of Jason Pelletier, Tyler Johnson, Robert Perazella, and Jenna Longo state they did not see Couture grab, drag, or hurt Nicholas, but do not say that they were present on the day of the alleged assault.  Def. Exh. BBB, CCC, GGG, HHH.  Dana Blasi states that Nicholas liked school, smiled a lot and had fun, while Jenna Longo states that no one wanted to sit with Nicholas at lunch.  Def. Exh. AAA, CCC.  Jenna Skerritt states that Couture got angry with Nicholas and that her classmates teased Nicholas during recess.  Def. Exh. DDD.  Similarly, Jonathan Lago states that other students were mean to Nicholas and called him names.  Def. Exh. EEE.  Tyler Johnson states that Nicholas was teased by other students, but that he teased other students also.  Def. Exh. HHH.

Only three of the students whose affidavits were filed indicate they were present and recall the incident the DiStisos complain of.  Jonathan Lago states that he heard Couture tell Nicholas to go to Cook's office and that he did not see Couture assault Nicholas, but does not say that it did not happen.  Def. Exh. EEE.

Megan Chambrello states that she saw Couture bring Nicholas to Cook's office while holding his hand, but did not see Couture hurt Nicholas.  Def. Exh. FFF. She further states that Nicholas was sad afterwards.  Id.  Jenna Skerritt states that Couture told Nicholas to go to Cook's office and he refused.  Def. Exh. DDD. This contradicts Couture's statement to Officer Egan that she was escorting Nicholas in compliance with school policy because he was not obeying her rules, and that Nicholas willingly accompanied her.  Def. Exh. UU.  Jenna Skerritt also says that Couture held Nicholas' hand, but when they were walking out the door Nicholas started tugging the other way.  Id.  Def. Exh. DDD.  This statement could be inconsistent with those of the teachers and nurse interviewed by Officer Egan, who said that Couture was not touching Nicholas.  Def. Exh. UU.  Her statement also tends to support Nicholas' claim that he was yanked.  A trier of fact could conclude that Couture yanked Nicholas based upon the fact that Skerritt states that Nicholas refused to go to the principal's office, that Couture held his hand in order to make him go, and that Couture had a tendency to get angry at Nicholas. Def. Exh. DDD.

As discussed above, the record reflects several specific instances in which the DiStisos complained to Couture that Nicholas was being physically abused. Although it does not appear from the record that the DiStisos explicitly informed Couture that they believed the abuse to be racially motivated, following the February 9, 2003 incident, Robin DiStiso sent a note to Couture complaining about Couture's practice of blaming Nicholas when he was physically abused by

other students.  In the letter, Robin DiStiso stated "I know why you are doing this."  Def. Exh. HH.  Her statement could be interpreted to be referring to racially discriminatory conduct about which they had spoken previously.  Furthermore, as discussed above, it would be reasonable for a jury to conclude that Couture was aware of the racial harassment Nicholas was subjected to in kindergarten given the pervasive nature of that harassment as well as her participation in the PPT process, during which the DiStisos reiterated their allegation that Nicholas was referred for special education services in retaliation for their complaints of racial discrimination.  Thus, Robin DiStiso's statement, together with Couture's participation in the PPT process, is evidence that Couture was aware of racial animus toward Nicholas on the part of other students who were harassing and abusing him during the first grade, and therefore creates a genuine issue of material fact for trial as to whether she was deliberately indifferent to known harassment.

Furthermore, there is a question of material fact as to whether Couture's responses to the instances of physical abuse of which she was made aware were "clearly unreasonable" under the circumstances.  The record indicates that Couture failed to take any personal action in response to any of the incidences of physical abuse of which she was made aware, apart from blaming Nicholas for misbehaving.  Instead, she reported each incident to Cook, who in turn conducted an investigation and reported his findings to the DiStisos.  Under the circumstances of this case, where there is evidence of a pervasive and

continuing pattern of racial harassment and physical abuse perpetrated against Nicholas over a period of two years, the Court cannot say as a matter of law that no jury could find Couture's lack of action in response to the many incidents of which she was aware to be "clearly unreasonable."

The repeated instances of abuse to which Nicholas was subjected over the course of two years clearly distinguishes the facts of this case from those of Gant, where the Second Circuit found that a teacher's failure to personally respond to the single incident of racial name-calling of which she was aware did not constitute deliberate indifference where another teacher had previously spoken with the offending students and reported the incident to the principal. 195 F.3d at 142. Instead, the facts of this case are more similar to those present in United States v. Davis, where the Supreme Court held that a private damages action may lie against a school board based upon the board's deliberate indifference where the plaintiff's daughter was the victim of repeated acts of sexual harassment by another student over a five month period of time. 526 U.S. at 653.

Further, as described in detail below, there is substantial evidence in the record that Cook himself was deliberately indifferent to racial discrimination against Nicholas, which further calls into question the efficacy of Couture's apparent abdication of responsibility to directly address the inappropriate actions of her first grade students. Finally, there is evidence in this case that Couture personally assaulted Nicholas in March 2004. Given the history of racial

discrimination against Nicholas and the aforementioned evidence suggesting that Couture was aware of this discrimination and failed to stop it, it would be reasonable for a jury to infer that Couture acquiesced in or fostered racial discrimination and thus that this alleged assault was racially motivated as well. As Judge Calabresi explained in his concurrence in <u>Gant</u>, Couture's alleged discriminatory act must be considered in determining whether her response to the harassment and abuse perpetrated against Nicholas by his peers was "clearly unreasonable" in light of known circumstances. 195 F.3d at 150. Based upon all of the foregoing evidence, the Court concludes that there is a genuine issue of material fact as to whether Couture was deliberately indifferent to peer discrimination against Nicholas, and therefore she is not entitled to qualified immunity.

### 3. <u>Cook</u>

The DiStisos' history with Cook preceded Nicholas' entry into kindergarten at Wakelee. Robin DiStiso testified during her deposition that her older daughter, Janice, had previously attended Wakelee High School from 1994 to 1997 when Cook was principal there. R. DiStiso Dep. at 56. For two years, the word "nigger" was written on the outside wall of the High School in three different places. <u>Id.</u> at 56-57. Although both Robin DiStiso and her daughter personally complained about the offending words to Cook on multiple occasions, Cook did nothing to remove them from the exterior of the building for several months, claiming that he would have to look into getting some "special chemical" in order to do so. <u>Id.</u>

at 60-61.  James DiStiso, Nicholas' older brother, also allegedly experienced racial discrimination while at Wakelee when Cook was principal.  During the fourth or fifth grade, another student repeatedly called James "nigger" and told him "to go back to Africa."  Id. at 62.  Robin DiStiso wrote to James' teacher about these incidents, but received no response.  Id.  Robin DiStiso thereafter contacted Cook, who merely responded that the teacher was taking care of the issue and failed to take any action himself.  Id.  James experienced similar discrimination from other students later during the fifth grade.  Id. at 70.  Robin DiStiso called Cook on two occasions to complain about the behavior, but Cook again failed to adequately address the issue.  Id. at 70-71.

As discussed previously in the context of the equal protection claim against Uccello, the DiStisos both testified that there were several times during kindergarten when Nicholas complained that other students had called him "nigger," "blackie," and "dirty."  It is not clear from the testimony when exactly Cook was first informed of the name-calling.  Philip DiStiso indicated that his wife first relayed the name-calling to Uccello, but that she then began calling Cook when the other students continued to call Nicholas racially derogatory names.  P. DiStiso Dep. at 48-49.  Robin DiStiso also testified that she called Cook on several occasions to complain of the name-calling.  R. DiStiso Dep. at 165-66.  While she was unable to recall exactly when she first spoke with Cook, she believed it was within the first six weeks of kindergarten.  Id.  Robin DiStiso further testified that she asked Cook to speak with Uccello about the name-calling, and Cook said that

he was going to check into it.  **Id.**  However, Cook failed to get back to her.  **Id.**  She then left two or three voice messages for Cook, which Cook ignored.  **Id.**  According to Robin DiStiso, the name-calling continued throughout kindergarten, but she did not speak with him about it again.  **Id.**

Philip DiStiso also testified that he once discussed the racial harassment of Nicholas with Cook while he was in Cook's office.  P. DiStiso Dep. at 68-69.  During this conversation, Philip DiStiso told Cook that, instead of watching Nicholas so frequently, he should start "watching the kids that are calling him names and picking on him and punching him and everything[.]"  **Id.** at 69.  Philip DiStiso further testified that he did not tell Cook specifically what names the other students were calling Nicholas on this particular occasion because it was far into the school year and Cook was aware of the names because the DiStisos had made several complaints about the exact names in the past.  **Id.**  It is unclear what, if any action Cook took in response to Philip DiStiso's complaint.

Cook avers that he disciplined Nicholas for misbehaving at school on multiple occasions and spoke with the Distisos about his misbehavior.  Cook Aff. ¶¶ 7-9.  However, he denies ever receiving a complaint from the DiStisos that Nicholas was being discriminated against or harassed because of his race, until the filing of the CHRO complaint in May 2003.  **Id.** ¶ 10.  Cook claims that once he learned of the allegations in the CHRO complaint, he conducted what he characterizes as a "full" investigation into the matter, but did not find any evidence to support the allegation that Nicholas' peers or Uccello were harassing

or discriminating against Nicholas because of his race.  Id. ¶ 11.  However, apart from interviewing Uccello, Cook does not describe any specific actions he took to investigate the DiStisos' claims of racial discrimination.  Furthermore, there is no evidence in the record to support Cook's conclusory assertion that he conducted a "full" investigation and failed to uncover evidence of racial discrimination or harassment.

The DiStisos did not identify any specific instances during the first grade in which Nicholas was called racially derogatory names by other students.  The DiStisos did, however, testify regarding several occasions during the first grade in which other students allegedly physically abused Nicholas by throwing juice at him, kicking him, or hitting him.  The DiStisos complained to Couture regarding these incidents, who in turn communicated them to Cook.  The details of each specific incident, and Cook's response to each incident, are discussed above in the context of the equal protection claim against Couture.  See supra Section III.A.2.

One additional incident bears mentioning.  On October 7, 2003, Philip DiStiso personally visited Cook at Wakelee and informed him that a "tall black haired man with a beard and glasses" removed Nicholas from his classroom on October 3, 2003 and asked him questions about matters relating to the CHRO complaint.  Cook Aff. ¶ 17; P. DiStiso Dep. at 179-81.  Cook questioned Couture, who informed him that Nicholas was removed from class on the day in question by the female reading consultant.  Id.  Cook informed Philip DiStiso of this, who

37

replied that Cook had a "strange fascination" with Nicholas and indicated that he was going to contact the police to investigate the incident.  Id.  Philip DiStiso contacted the police, and an officer came to the school to question Cook and Couture about the incident.  Id.  Thereafter, the police officer closed the case without a report.  See Def. Exh. U.

As discussed previously, on March 15, 2004, Philip DiStiso reported to the police that Couture had assaulted Nicholas three days earlier.  Cook spoke with the investigating officer, and the officer also interviewed Couture and other school staff although, as noted above, none of the other witnesses interviewed were present in the classroom during the alleged assault.  Def. Exh. UU. Thereafter, on March 26, 2004, Cook sent a letter to the DiStisos expressing his concerns about Nicholas' failure to attend school for ten consecutive days, which he claims is a regular practice when a child is absent for multiple consecutive days without reason.  Cook Aff. ¶ 31.  The DiStisos refused to accept the letter, and removed Nicholas from Wakelee and placed him in a private school.

As is the case with Uccello, the evidence in the record indicates that the DiStisos complained to Cook early in the kindergarten school year that other students were calling Nicholas racially derogatory names such as "nigger," "blackie," and "dirty."  According to the DiStisos, Cook entirely failed to respond to their repeated complaints.  In addition, Philip DiStiso claims that he informed Cook in person that other students were calling Nicholas names as well as picking on him and punching him.  The racial name-calling and physical abuse

purportedly continued throughout the school year unabated. Only after the DiStisos filed the CHRO complaint did Cook claim that he conducted an investigation into the DiStisos' allegations of racial discrimination and harassment, and even then, the record does not indicate what steps Cook underwent to investigate the allegations apart from interviewing Uccello.

Although the record does not reflect any specific instances in which Cook was informed of racial name-calling after Nicholas entered the first grade, there is substantial evidence that the pattern of physical abuse perpetrated against Nicholas by other students during kindergarten continued during the first grade. Given the prior history of racially derogatory name-calling during kindergarten as well as the filing of the CHRO complaint, of which Cook was well aware, a reasonable jury could infer that the acts of physical abuse that occurred during first grade were also racially motivated. See Patenaude, 2005 WL 6152380, at *8

It appears from the record that Cook responded to incidents that were reported to him during the first grade by investigating each incident, speaking with the parties involved, and reporting his findings to the DiStisos. Nevertheless, the Court finds, for the same reasons articulated above in the context of the equal protection claim against Uccello, that Cook is not entitled to qualified immunity based upon the evidence presented regarding his failure to take action in response to known discrimination against Nicholas in kindergarten. The Plaintiff presented evidence of a consistent pattern of racially derogatory name-calling and physical abuse by other students that occurred throughout the

kindergarten school year.  The DiStisos claim that they informed Cook of this conduct, yet he failed to take any action to investigate it or put a stop to it, and instead placed the blame entirely on Nicholas.  In such circumstances, the jury could well conclude that a reasonable official in Cook's position would have understood that his conduct constituted deliberate indifference to Nicholas' clearly established right to be free from racial discrimination by other students in school.  Further, as detailed above, the Plaintiff has presented evidence that Cook previously failed to respond to known incidents of discrimination against Nicholas' older siblings when they attended Wakelee, which provides further evidence of Cook's discriminatory intent.  Therefore, Cook is not entitled to qualified immunity with respect to the Plaintiff's equal protection claim against him.

### B.  Due Process

The Court will next consider whether Cook, Uccello, and Couture are entitled to qualified immunity with respect to the Plaintiff's claims that their conduct violated Nicholas' substantive due process rights.

As an initial matter, the Court notes that the Plaintiff's claim asserting that the Defendants' deliberate indifference to racial discrimination and harassment of Nicholas by other students at Wakelee is more properly treated as an equal protection claim rather than a substantive due process claim.  See Conn v. Gabbert, 526 U.S. 286, 293 (1999) ("[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must

assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.") (citation and internal quotation marks omitted).  However, to the extent that the Plaintiff is attempting to assert a substantive due process claim based upon allegations of deliberate indifference, the Defendants would be entitled to qualified immunity with respect to such a claim in light of the Supreme Court's decision in DeShaney v. Winnebago County, 489 U.S. 189, 197 (1989).

In DeShaney, the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  Id.  As the Supreme Court recognized, while the Due Process Clause protects individuals from abuses of power on the part of the State, it places no affirmative obligation on the States to protect against harm to private individuals by other private individuals, even if the government knows that such harm is imminent.  Id. at 195-96.  The Supreme Court in DeShaney did carve out a narrow exception to this rule that applies when an individual is in state custody or control against his will (such as imprisonment or commitment to a mental institution) and the defendant official is deliberately indifferent to a known harm.  Id. at 199-200.

Although the Second Circuit has not directly addressed the issue, district courts in this Circuit have repeatedly held that compulsory education law, and a school's role *in loco parentis*, does not so restrict a child's freedom so as to place him in state custody or control within the meaning of the exception

identified in <u>DeShaney</u>. <u>See</u>, <u>e.g.</u>, <u>Risica ex rel. Risica v. Dumas</u>, 466 F. Supp. 2d 434, 439 (D. Conn. 2006); <u>Santucci v. Newark Valley Sch. Dist.</u>, No. 3:05-CV-0971, 2005 WL 2739104, at *3 (N.D.N.Y. Oct. 24, 2005); <u>Bungert ex rel. Murcko v. City of Shelton</u>, No. 3:02-CV-01291 (RNC), 2005 WL 2663054, at *3-4 (D. Conn. Oct. 14, 2005); <u>Patenaude v. Salmon River Centr. Sch. Dist.</u>, No. 3:03-CV-1016, 2005 WL 6152380, at *11 (N.D.N.Y. Feb. 16, 2005).

Other Circuits that have addressed this issue have also held that a child is not in state custody or control while at public school and therefore that <u>DeShaney</u> bars a substantive due process claim for failure to protect. <u>See</u> <u>Hasenfus v. LaJeunesse</u>, 175 F.3d 68, 71-72 (1st Cir. 1999); <u>D.R. v. Middle Bucks Area Voc. Tech. Sch.</u>, 972 F.2d 1364, 1368-72 (3rd Cir. 1992); <u>Doe v. Hillsboro Ind. Sch. Dist.</u>, 113 F.3d 1412, 1415 (5th Cir. 1997); <u>Sargi v. Dent City Bd. of Educ.</u>, 70 F.3d 907, 911 (6th Cir. 1995); <u>J.O. v. Alton Cmty. Unit Sch. Dist. 11</u>, 909 F.2d 267, 272-73 (7th Cir. 1990); <u>Dorothy J. v. Little Rock Sch. Dist.</u>, 7 F.3d 729, 731-32 (8th Cir. 1993); <u>Maldonado v. Josey</u>, 975 F.2d 727, 731-32 (10th Cir. 1992); <u>Wyke v. Polk County Sch. Bd.</u>, 129 F.3d 560, 569 (11th Cir. 1997).

This case suggests reconsideration of the applicability of these precedents. School attendance is compulsory under Connecticut law. Conn. Gen. Stat. § 10-184. Parents who fail to send their child to school risk the loss of parental rights, including custody of their child. <u>See</u> Conn. Gen. Stat. § 17a-112(j) (parental rights may be terminated where clear and convincing evidence demonstrates that "the termination is in the best interest of the child" and "the

child has been denied, by reason of an act or acts of parental commission or omission . . . the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being"); Conn. Gen. Stat. 45a-717(g) (same); see also In re Amurah B., No. M08CP09010939A, 2010 WL 966645, at *1 (Conn. Super. Ct. Feb. 9, 2010) (evidence of parents' failure to cause their children to attend school as required by Conn. Gen. Stat. § 10-184 may be used to support petition for educational neglect). As the record of this case reflects, Wakelee filed a formal complaint against the DiStisos with DCF for educational neglect when they removed Nicholas from school after the alleged assault by Couture, and Smyth also filed a petition with Connecticut Superior Court alleging that the DiStisos were a family with service needs. Def. Exh. QQQ, RRR. Thus, the State of Connecticut compels parents to entrust their children to the care and custody of school officials, particularly those who lack the financial resources to enroll their children in private schools and those who lack either the intellectual capacity or time (or both) to home-school their children, and parents risk the loss of parental rights if they fail to comply. The other aspect of this case warranting consideration is the tender age of Nicholas and his consequent vulnerability and the potential formative harm he experienced. The facts of this case may be more akin to those of Youngberg v. Romeo, 457 U.S. 307, 314-25 (1982), where the Supreme Court held that the substantive component of the Due Process Clause requires the State to provide involuntarily committed patients with services

necessary to ensure their "reasonable safety" from themselves and others. As the Supreme Court stated in DeShaney,

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

489 U.S. at 200. Not unlike a committed mental patient, a young, impressionable and formative child of five to six years of age is highly vulnerable and in unquestionable need of the protection of those to whom he is entrusted.

Nonetheless, in light of the Supreme Court's decision in DeShaney and the weight of authority holding that the "special relationship" exception does not apply to children in schools, it would not have been clear to a reasonable official in the position of the present Defendants that failing to protect Nicholas from racial harassment and assaults by his classmates was unlawful. Therefore, they are entitled to qualified immunity with respect to this claim.

The Plaintiff further asserts that Couture violated Nicholas' right to due process by grabbing him by the arm and pulling him across the first grade classroom and that Uccello violated Nicholas' right to due process by forcing him to draw himself using a brown crayon when he was in kindergarten.

On appeal, the Second Circuit directed the Court to consider the Plaintiff's claim against Couture in light of its decision in Smith v. Half Hollow Hills Central School District, 298 F.3d 168 (2d Cir. 2002). In Smith, the plaintiff, a seventh grade student, was participating in a class exercise which involved balancing an

egg on the edge of his teacher's desk to illustrate the day of equinox.  Id. at 170.

Smith alleged that he attempted to balance the egg as instructed but it became

cracked through no fault of his own.  Id.  The defendant, his teacher, then slapped

him in the face at full force, allegedly causing him to experience severe physical

and emotional pain.  Id.  The district court dismissed the plaintiff's substantive

due process claim.  On appeal, the Second Circuit affirmed the dismissal, but

wrote to clarify the proper substantive due process analysis.

The Second Circuit explained that the "protections of substantive due

process are available only against egregious conduct which goes beyond merely

offend[ing] some fastidiousness squeamishness or private sentimentalism and

can fairly be viewed as so brutal and offensive to human dignity as to shock the

conscience."  Id. at 173 (internal quotations marks omitted).  The Second Circuit

disagreed with a portion of the district court's analysis finding that a single slap

could never "shock the conscience," explaining that "[w]e have never adopted a

per se rule that a single slap from a teacher or other school official can never be

sufficiently brutal to shock the conscience and invoke the protections of the due

process clause."  Id.  However, the Second Circuit held that, under the

circumstances of the case, it was clear as a matter of law that the defendant's

conduct did not reach that level.  The Second Circuit explained:  "Striking a

student without any pedagogical or disciplinary justification . . . is undeniably

wrong.  However, not all wrongs perpetrated by a government actor violate due

process."  Id.

The Second Circuit in <u>Smith</u> distinguished its earlier decision in <u>Johnson v. Newburgh Enlarged School District</u>, 239 F.3d 246 (2d Cir. 2001). In <u>Newburgh</u>, the parents of an eighth grade student brought a substantive due process claim alleging that, after the student threw a dodge ball toward his gym teacher from a distance of about twenty feet, the teacher grabbed him by the throat, yelled "I'll kick the shit out of you!," lifted him off the ground by his neck and dragged him across the gym floor, slammed his head into a metal fuse box and punched him in the face. <u>Id.</u> at 249. The Second Circuit held that the gym teacher's conduct constituted a violation of the student's substantive due process right to be free from the use of excessive force, and that he was not entitled to qualified immunity. <u>Id.</u> at 252-55. In support of this holding, the Second Circuit cited the extremely violent nature of the assault, the substantial injuries suffered by the student, the lack of a discernible government interest, and the potential racial bias on the part of the teacher. <u>Id.</u> The Second Circuit cautioned, however, that its analysis would not necessarily apply to cases involving lesser degrees of culpability, such as gross negligence or recklessness. <u>Id.</u> at 254. Thus, the Second Circuit endorsed a "culpability continuum" for determining the applicability of qualified immunity to an excessive force claim. <u>Id.</u> Under this continuum, conduct intended to injure in the absence of a government interest is most likely to rise to the level of a constitutional violation, whereas reckless or grossly negligent conduct that causes injury is a closer call and requires context-specific application of the right to be free from the use of excessive force. <u>Id.</u>

The Second Circuit has identified several factors to be examined in determining whether an alleged excessive use of force created a due process violation, including "the need for application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

The incident giving rise to the Plaintiff's claim against Couture allegedly occurred on March 12, 2004.  The details of the incident are described above in the context of the Plaintiff's equal protection claim against Couture.  See supra Section III.A.2.  Essentially, the DiStisos allege that Couture accused Nicholas of talking in class and ordered him to go to the principal's office.  After Nicholas stated that it had been another student who was talking, Couture grabbed him by the arm and pulled him out of his chair, causing him to fall to the ground and hit his legs on his desk, and then dragged him across the floor of the classroom and brought him to the principal's office.

The evidence before the Court on summary judgment indicates that Couture's conduct is this case was more similar to the conduct at issue in Smith than in Johnson, even though Couture may have harbored racial bias against Nicholas as evidenced by her alleged indifference to race-based abuse by his peers.  Viewing the facts in the light most favorably to the Plaintiff, the evidence shows that Couture pulled Nicholas out of his chair by the arm and dragged him

to the principal's office because she believed that he was disobedient and refused to go to the principal's office as she had told him.  Unlike in <u>Johnson</u>, there is no indication here that Couture applied force with the intent to injure Nicholas.  Instead, the evidence indicates that Couture applied force in an attempt to maintain discipline by bringing Nicholas to the principal's office, a legitimate pedagogical and governmental purpose.  The level of force used by Couture was not nearly as extreme as that used by the gym teacher in <u>Johnson</u>.  Further, Nicholas was not serious injured.  Apart from his self-reported pain and Dr. Ransome's testimony that he may have suffered a muscle strain, there is no evidence that Nicholas suffered a discernible physical injury as a result of Couture's conduct.  While Couture may have been wrong to use force against Nicholas under the circumstances, in light of controlling Second Circuit law, it cannot be said that a reasonable official in Couture's position would have understood her actions to constitute a violation of the Due Process Clause.  Therefore, because Couture is entitled to qualified immunity with respect to the Plaintiff's excessive use of force claim against her, this claim is dismissed.

Finally, with respect to the Plaintiff's due process claim against Uccello, the parties did not cite and the Court is unaware of any cases supporting the proposition that instructing a bi-racial African American child of undescribed hue to use a brown crayon to draw a picture of himself constitutes a violation of substantive due process.  The most analogous cases involve allegations of verbal harassment, name-calling, and taunts on the part of government officials.

In such cases, the Second Circuit requires that the Plaintiff demonstrate a specific injury resulting from the objectionable conduct in order to sustain a 42 U.S.C. § 1983 claim.  See Johnson v. Eggersdorf, 8 Fed. Appx. 140, 143 (2d Cir. 2001) ("In this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged."); Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (dismissing 42 U.S.C. § 1983 claim based upon name-calling because the plaintiff failed to allege any appreciable injury); see also Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474-75 (S.D.N.Y. 1998) (finding psychological harm caused by the defendants' uttering of racial slurs directed at the plaintiff to be de minimus, and therefore dismissing plaintiff's 42 U.S.C. § 1983 claim based upon verbal abuse); Jermosen v. Couglin, No. 87 Civ. 6267 (RJW), 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993) (dismissing 42 U.S.C. § 1983 claim based upon allegation that officers approached plaintiff with their nightsticks raised in a threatening position before conducting a strip search because the plaintiff did not introduce any evidence that the incident left him with "significant psychological scars" and therefore the officers' taunts were not enough to "cause the degree of psychological pain which rises to the level of a constitutional violation").

While Nicholas was at an acutely developmental age and Uccello was a person entrusted and responsible to foster her students' positive psychological development, the record in this case does not reveal any specific evidence of injury suffered by Nicholas as a result of the crayon incident, apart from Robin DiStiso's testimony that he was upset.  The Court recognizes that psychological

harm may be sufficient to support a claim for violation of constitutional rights in certain circumstances. However, in light of the absence of directly relevant precedent and the above-cited holdings limiting recovery for verbal harassment and name-calling to situations in which a significant injury is demonstrated, it cannot be said that it would have been clear to a reasonable official in Uccello's position that directing Nicholas to draw a picture of himself using a brown crayon violated his substantive due process rights. Therefore, Uccello is entitled to qualified immunity with respect to the Plaintiff's due process claim against her.

## IV.  CONCLUSION

Based upon the above reasoning, the Court holds that Cook, Uccello, and Couture are not entitled to qualified immunity with respect to the Plaintiff's equal protection claims. However, the Court further holds that Cook, Uccello, and Couture are entitled to qualified immunity with respect to the Plaintiff's substantive due process claims, and therefore the substantive due process claims are dismissed. This case will proceed to trial on the Plaintiff's surviving claims in accordance with the Court's scheduling order entered on May 18, 2010. See Doc. #98.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  October 19, 2010.